543 So.2d 642 (1989)
CHRYSLER CREDIT CORPORATION
v.
UNITED STATES FIDELITY AND GUARANTY COMPANY. (Two Cases)
Nos. 88 CA 0572, 88 CA 0573.
Court of Appeal of Louisiana, First Circuit.
May 16, 1989.
*643 G. Thomas Arbour, Port Allen, for plaintiff-appellee, Chrysler Credit Corp.
Horace Lane, Baton Rouge, for defendant-appellant U.S. Fidelity and Guaranty Co.
Before WATKINS, CRAIN and ALFORD, JJ.
WATKINS, Judge.
Chrysler Credit Corporation (Chrysler Credit) brought two consolidated actions against United States Fidelity and Guaranty Company (USF & G), seeking to recover the policy limits under two motor vehicle dealer fidelity bonds issued by USF & G to Lonnie Freeman Chrysler-Plymouth-Dodge Truck, Inc. and Perry-Chrysler Plymouth, Inc. The trial court granted a partial summary judgment in favor of Chrysler Credit awarding it the policy limits of each bond, totalling $40,000. The trial court retained jurisdiction of Chrysler Credit's remaining claim for attorneys' fees and penalties. We reverse.
In 1981, Perry-Chrysler Plymouth, Inc. and Lonnie Freeman Chrysler-Plymouth-Dodge Truck, Inc. were licensed automobile dealers in Louisiana. Each dealership had a financing contract with Chrysler Credit for the purchase of Chrysler, Plymouth and Dodge automobiles and trucks. To secure the loans Chrysler Credit took a floor plan chattel mortgage on the total stock of each dealership. As the vehicles were sold the dealers were required to keep the proceeds of any sale separate from all other funds, and on the day of the receipt of such proceeds to transmit them to Chrysler Credit.[1] Apparently, sometime in 1981, each dealership, through its officers, tortiously converted funds which belonged to Chrysler Credit, (i.e., the dealerships sold mortgaged vehicles and did not remit the funds to Chrysler Credit). Chrysler Credit filed suit against USF & G alleging that the tortious conversion of the funds, by the dealerships, was an act which was covered by the bonds issued by USF & G to the dealerships.
USF & G does not dispute the fact that Julian Perry and Lonnie Freeman tortiously converted funds belonging to Chrysler Credit in excess of the $20,000 limit of each bond. Therefore, the sole issue before the court is whether a motor vehicle dealer fidelity bond (under LSA-R.S. 32:1254 M.) provides indemnity to a financial institution when funds belonging to said financial institution are tortiously converted by the owner of the dealership in direct derogation of the terms and agreements of a floor plan mortgage.
Chrysler Credit contends that it is entitled to collect on the fidelity bonds because it is a "person", within the meaning of LSA-R.S. 32:1254 M. (3), who has suffered a loss as a result of a violation of a written contract in connection with the sale or exchange of motor vehicles, or due to violations of Louisiana law. The trial court agreed with this view, setting forth the following reasons for its decision.
This is a novel point of law and I think that both sides make sense. It's difficult for me to arrive at a decision under the circumstances, but I think that the statutue, (sic) ... contains broad language that does not preclude Chrysler from recovering under the bond. I note that a tortious conversion is a violation of law upon which the bond is conditioned. Chrysler falls within the definition of any person suffering a loss and the addition of a financial institution definition to a statute does not make the situation mutually exclusive. And because of that, the retroactivity question becomes moot.
I am going to grant the motion for partial summary judgment in favor of Chrysler, and I presume that the first *644 circuit will give us a final pronouncement on what the law is in this instance.
USF & G appealed this judgment, alleging that the trial court erred in granting the partial summary judgment ordering USF & G to pay Chrysler Credit the limits of the two automobile dealer fidelity bonds. USF & G argues that the purpose of the bonds is to protect the buying public from unscrupulous automobile dealers, not to cover the losses of automobile finance companies by providing a security or mortgage on loans made by sophisticated lenders, such as Chrysler Credit.
Louisiana law provides that before any motor vehicle dealer's license is issued to an applicant, a good and sufficient surety bond, executed by the applicant as principal and by a surety company qualified to do business in Louisiana as surety, in the sum of $20,000, shall be delivered to the Louisiana Motor Vehicle Commission. The bonds are primarily governed by LSA-R.S. 32:1254 M. (3) which provides as follows:
Such bonds shall be in a form to be approved by the commission and shall be conditioned so that the dealer or lessor shall comply with the conditions of any written contract made by such dealer or lessor in connection with the sale or exchange of any motor vehicle and shall not violate any of the provisions of this Chapter or any other law of Louisiana in the conduct of the business for which he is licensed. Such bond shall be made payable to the secretary of the Department of Public Safety and Corrections or to his successor in office, for the use, benefit, and indemnity of any persons who shall suffer any loss as a result of any violation of the conditions hereinabove contained. Such bond shall be for the license period and a new bond or a proper continuation certificate shall be delivered to the Louisiana Motor Vehicle Commission at the beginning of each license period; however, the aggregate liability of the surety in any one year shall in no event exceed the sum of such bond. (Emphasis added.)
Although the above section, read alone, appears to permit a broad scope of recovery on the bonds, further analysis of the statute in which the above section is placed reveals a more narrow purpose for which the bonds were intended. Insight into the legislative purpose of the bonds is found in LSA-R.S. 32:1251, which defines the public policy behind the statutes governing the distribution and sale of motor vehicles. It reads as follows:
The legislature finds and declares that the distribution and sale of motor vehicles in the state of Louisiana vitally affects the general economy of the state, the public interest, and the public welfare, and that in order to promote the public interest, and the public welfare, and in the exercise of its police power, it is necessary to regulate and to license motor vehicle manufacturers, distributors, dealers, and lessors doing business in Louisiana, in order to prevent frauds, impositions, and other abuses upon its citizens, and avoid undue control of the independent motor vehicle dealer by the motor vehicle manufacturing and distributive organizations and foster and keep alive vigorous and healthy competition, by prohibiting unfair practices by which fair and honest competition is destroyed or prevented, and to protect the public against the creation or perpetuation of monopolies and practices detrimental to the public welfare, to prevent the practice of requiring the buying, leasing, or renting of special features, appliances, and equipment not desired or requested by the purchaser, lessee, or renter, to prevent false and misleading advertising, to prevent unfair practices by motor vehicle dealers, lessors, manufacturers, and distributing organizations, to promote the public safety and prevent disruption of the system of distribution of motor vehicles to the public and prevent deterioration of facilities for servicing motor vehicles and keeping same safe and properly functioning, and prevent bankrupting of motor vehicle dealers and lessors, who might otherwise be caused to fail because of such unfair practices and competition, thereby resulting in unemployment, *645 disruption of leases, and nonpayment of taxes and loans, and contribute to an inevitable train of undesirable consequences, including economic depression.
Giving the words "the public" and "citizens" as used in the statute their fair import and ordinary meaning, a logical reading of the Declaration of Public Policy section would indicate that the purpose of the statute is: (1) to assure businessmen do not establish an inordinate number of car dealerships around the state, failure of which would adversely affect the economy; (2) to protect independent dealerships from undue control by manufacturing and distributive organizations; and (3) to protect the ordinary citizen from abuse and unfair business practices of dealerships. The clear intention of the legislature is to protect the independent dealerships in the manufacturer/dealership relationship and the consumer in the dealership/consumer relationship. The focus of the legislative protection is in a downward pattern from the manufacturer all the way to the ultimate consumer, with the manufacturer being viewed as the most powerful of the parties. A reading of the statute as a whole supports this interpretation with rules designed to define and regulate the above mentioned relationships. These relationships are further defined and regulated by the Rules and Regulations promulgated by the Louisiana Motor Vehicle Commission, which detail with more specificity the conduct which the Commission finds unacceptable. Specifically, section 20 enumerates 17 business practices to which the dealership must adhere. These provisions speak in terms of the buying public and protection from deceptive advertising practices, bait and switch schemes, deceptive credit sales plans, and other deceptive practices.
A further indication that the bonds were not intended to protect financial institutions in their dealings with dealerships is the relatively small amount of the bond in comparison to the amount of financing ordinarily required by a dealership. Moreover, the bond is meant to cover the aggregate of any claims against the dealership in one year. If the intent had been to protect finance companies, certainly the bond requirement would far exceed $20,000.
Although Julian Perry and Lonnie Freeman violated Louisiana law when they tortiously converted funds belonging to Chrysler Credit, we do not believe that the automobile dealer fidelity bonds were intended to indemnify Chrysler Credit for such loss. Interpreting the statute to permit recovery on the bonds to protect every person from every act of a dealer in connection with his management of a dealership would defeat the intended purpose of the statute. We hold that the bonds were intended to protect the ordinary consumer in the purchase or exchange of automobiles with such dealers. A more expansive interpretation would more than likely cause depletion of the bond funds, leaving innocent purchasers without recourse against the bonds.
Accordingly, we reverse the judgment of the trial court. All costs to be paid by appellee.
REVERSED.
NOTES
[1] Although a chattel mortgage usually follows the mortgaged property into the hands of a buyer, Louisiana law provides that a good faith buyer of an automobile is protected against such a floor plan mortgage, and the lender's mortgage does not afford it security against sales of the mortgaged property in the normal course of business. LSA-R.S. 32:710(C). Instead, the dealer is required by contract to keep the proceeds of any sale separate from all other funds and on the day of the receipt of such proceeds to transmit them to its creditor, in this case Chrysler Credit Corporation.